JOHN J. PLEMENIK, complainant-appellant,

*v.*

COOPER H. PRICKETT, THE GRAND LODGE OF THE MOST HON-
ORABLE SOCIETY OF FREE AND ACCEPTED MASONS et al.,
defendants-respondents.

[Decided January 19th, 1925.]

On appeal from a decree of the court of chancery advised
by Vice-Chancellor Bentley, who filed the following opinion:

"The defendant the Grand Lodge of the Most Ancient and
Honorable Society of Free and Accepted Masons for the State
of New Jersey, is that division of masonry that has supreme
control within this state, having within its power, among
other things, to charter or permit the formation of subor-
dinate or local lodges throughout the state. It had existed
prior to its incorporation in 1866 by an act of the legislature.
In 1865 it chartered the lodge known as Schiller lodge.
Under the by-laws of the grand lodge it was required that
the by-laws, whether in the form of a constitution or by-laws,
or both, of a subordinate lodge before becoming effective,
must be approved by the grand lodge. The by-laws of
Schiller lodge provided, among other things, that all of the
records and proceedings of Schiller lodge, whether written
or spoken, should be carried on in the German language.
This provision was regularly approved by the grand lodge.

"On April 17th, 1918, at its annual meeting or convention,
the grand lodge adopted a resolution pursuant to a recom-
mendation of the grand master thereof, its presiding officer,
that 'all the lodges of this jurisdiction be required to use
none other than the standard ritual in the English language,
and that the lodge records be likewise kept.' Obedience to
that resolution was given by Schiller lodge until the fall of

1919. In the summer of the latter year, after the end of the world war, an application was made on behalf of Schiller lodge to the grand master to relieve it from further compliance with the aforesaid resolution, upon the ground that the reason for the resolution having passed there was no longer any occasion for its being enforced. This permission was denied.

"In the fall of 1919 the subordinate lodge, in disobedience of the direction of the grand lodge, again reverted to the use of the German language in its work. Whereupon, it was visited by an officer of the grand lodge, who took into his possession the charter of Schiller lodge, without which it cannot hold any meetings under the masonic law, and such proceedings were subsequently had that charges were prepared against the local lodge and tried by a committee of the grand lodge under the latter body's judicial power. This trial resulted in a forfeiture of the warrant of Schiller lodge, which, in effect, wipes it out of existence.

"The bill is filed by the last master or presiding officer of Schiller lodge, and is exhibited against the grand lodge and certain of its officers. Schiller lodge at the time of its dissolution had or was possessed of certain funds, which it had accumulated through the payment of dues and otherwise. I feel that the determination of the rights of the complainant in this property is sufficient to retain the bill for consideration of it on the merits, especially in view of the earnest request by the defendants as well as the complainant that the entire matter be disposed of.

"The complainant in his brief, at pages 41 and 42, waives all other questions, and bases his right to relief exclusively upon the following proposition:

" 'The resolution of 1918 is invalid, and, therefore, all acts of the grand lodge predicated thereon should, as far as they affect the complainant, the Schiller lodge, of which he is the head, be likewise declared invalid.'

"To attempt to answer the brief filed on behalf of the complainant in detail would be intolerable. The bill must be dismissed. It is so well established as not to require citation

and authorities, that courts will not interfere with the internal affairs of voluntary associations such as is to be dealt with her, except in cases of fraud, lack of jurisdiction, &c. The selection of a language to be used in the work of such a society is entirely within the discretion of the governing body thereof. *Grand Lodge, I. O. O. F., of New Jersey* v. *Wieland Lodge et al., 93 N. J. Eq. 129.*

"The complainant insists, however, that the resolution providing for the change from German to the English language was not legally adopted, for the reason that the masonic law provides that the by-laws shall not be changed unless proposed in writing and seconded, and then only if the same shall lie over for one year for consideration at the next annual communication or convention of the grand lodge. But section 21 of the general regulations of the grand lodge wherein that law is laid down, contains a proviso that any such proposition may be acted upon at once by unanimous consent. In the matter under consideration the resolution was adopted at the same communication at which it was originally ordered. But the printed record of that meeting shows that the adoption of the resolution was by unanimous consent. It is true that at the final hearing the complainant testified that he did not vote for the adoption of such resolution, but it can scarcely be argued seriously that his testimony to this effect, uncorroborated in any way, should be allowed to overcome the official record of the meeting.

"The jurisdiction and extent of the authority of such an association as is being dealt with here over its members will be found considered in the cases collected in *3 L. R. A. 413; 9 L. R. A. 428; 13 L. R. A. 625.*

"Counsel for the complainant has argued with great earnestness and ability, both orally and in his brief, many things that might well have been urged upon the members of the grand lodge against the adoption of the resolution in question. Those arguments might or might not have swayed the judgment of that body, but as legal arguments addressed to a court they can be of no avail, for the reason that they are directed to matters of policy and not of law. It would be an

outrageous thing if the framing of the policies of masonry could be usurped by this court, because from that it would be but a step to usurping the same power with other like organizations, to the end that property rights would be jeopardized. The complainant has asked this court to substitute its judgment as to whether or not any other language but the English language should be allowed in the masonic work, and the court refuses so to do.

"I will advise a decree dismissing the bill."

MINTURN, J. (dissenting).

Free speech is the issue involved, and, therefore, I enter my dissent to the decree appealed from, which justifies its suppression.

In 1865, immediately after the civil war, in which thousands of German immigrants, led by Schurz, Sigel, Heintzelman, Kudlich and others, had thrown themselves in the cauldron of the tremendous conflict, to preserve the integrity of the union, a desire to perpetuate the old traditions, language, music and scholarship led them to form various societies throughout the land. These societies were instrumental, not only in preserving memories of the valor and sacrifices of the race in the great internecine conflict, but served also as a means of preserving the memories of those great leaders of our revolutionary struggle, like Von Steuben, Muhlenberg and Herkimer, who did so much to assist as drill masters of the continental forces.

Among these organizations was Schiller Lodge of Masons, which was organized under the Grand Lodge of the Most Ancient and Honorable Society of Free and Accepted Masons, with a provision in its by-laws or charter that it "shall conduct all its affairs in the German language." For fifty years this lodge, without hindrance or objection from any source, so conducted its proceedings. When the great war ensued, in obedience to a proper recommendation from the grand lodge, it voluntarily ceased the use of the German tongue, and continued so to do until after the termination of the war, in the year 1919, when it resumed the use of German, in ac-

cordance with its charter and contract right. To this the master of the grand lodge objected, and his objection was supported by the committee on masonic jurisprudence, and, eventually, by the resolution of the grand lodge. Schiller lodge, refusing to conform to the request of that body, the complainant, as master of Schiller lodge, was deposed; its charter was forfeited, and its property, including $3,000 in cash, was confiscated by the grand lodge.

Much masonic learning is recited in the briefs of learned counsel upon the essential fundamentals of masonry, in order to enlighten us upon the propriety of this procedure. It must suffice for one, whose knowledge of the order is entirely the result of early study, to remark that its great strength resided in a beautiful conception of an universality of purpose, and an entire absence of provincialism. It provided for a league of nations, bringing together in one communion of thought men of all nationalities and all tongues, under the inspiring creed of a Fatherhood of God and a brotherhood of man. Tennyson aptly depicts its purpose, as the realization of an era:

> "When the war drum throbs no longer,
>  · And the battle flag lies furled,
> In the parliament of man,
>  The federation of the world."

If, as would appear from the procedure under consideration, this great conception of life is to be surrendered for an assumption of all the ills that selfish militant states are heirs to, then we have a situation in which masonry has been reduced to a status of provincialism and parochialism, and a luminous star that has lighted humanity over the deserts of destroyed empires and waning civilizations, has, indeed, lost its lustre and its attractive and powerful appeal to humanity. What was done in this instance with the lodge and its property could properly be effectuated under the circumscribed doctrines of other beneficial orders of state and national limitations, but not under the inspiration of an order which, in its age-long and world-wide conception of brotherhood,

knows no language, color or creed, and no national boundaries or limitations.

Under this proscription of Schiller lodge, the stars of German literary and scientific life, the adopted sons of the world, Goethe, Jean Paul, Schiller, Schlegel, Hegel, Kant, Mozart, Hayden, Handel, Wagner, Straus, with many other world stellar lights, would be debarred from membership, not to mention Luther, who spoke only in German and Latin.

The legal question propounded is one of contract; for if Schiller lodge contracted with the predecessor of the grand lodge, through its by-laws, to "conduct all its affairs in the German language," some authority must be adduced which will warrant the breach of that contract by the grand lodge. No such authority is produced; nor is it contended that the grand lodge inherently possesses any such power, as was here exercised, under the tenets of masonry, except for a violation of the fundamental doctrines of the order, or as stated in the language of the proviso to the charter of Schiller lodge, unless the latter shall violate "the rules and ordinances lawfully made or to be made for the benefit of masonry."

In the cases presented by counsel, such as *Grand Lodge, I. O. O. F.,* v. *Wieland Lodge, 93 N. J. Eq. 129,* the power to abrogate was conceded to exist in the grand lodge, for disobedience and infraction of rules. In those cases the grand lodge constituted the infallible guide and authority for the direction of local lodges, and the decisions are put upon that ground. Here no such power was conceded to the grand lodge, and under the tenets of masonry none exists, and the conspicuous facts dominating the entire situation is, that Schiller lodge, under the concession of its charter, exercised this contractual right of procedure for over fifty years, without hindrance or protest. This violation, not only contemned masonic fundamentals, but it violated the spirit of American constitutional law, in denying to the members the right of free speech in any language they might select.

The most notable recent instance, vindicating that right, is *Meyer* v. *Nebraska, 262 U. S. 391,* where it was held that "the

protection of the federal constitution extends to those who speak other languages, as well as those who speak English," and, further, that "An act of the legislature forbidding the teaching in school of any other than the English language, until the pupil has reached the eighth grade, violates the guaranty of liberty in the fourteenth amendment to the federal constitution, in the absence of a sudden emergency rendering knowledge of the foreign language clearly harmful."

In other lands, notably in England, and in polite society quite generally, education is not deemed complete without the addition of another language. Our highest educational institutions, including our public schools, when not rocked in the madness of war, have departments of *belle lettres,* which include the acquisition of some foreign language.

In Rome, according to Gibbon, "those who united letters with business were equally conversant with both Greek and Latin, and he informs us "it was almost impossible in any province to find a Roman subject of a liberal education who was at once a stranger to the Greek and to the Latin tongues." *Gibb. Rome ch. 2.*

The province of Quebec, for two hundred years, has maintained a stable government, using two languages, and Switzerland, the oldest republic extant, permits the use of three languages in official procedure. And, after all, it is not the language which one uses, which indicates the measure of the man, or the extent and profundity of his patriotism, but the heart, the mind and the soul that inspires his utterances. Indeed, were it otherwise, the condemnation visited upon the members of this lodge might well extend its potent influence, to suppress, at least, one member of this court, who occasionally points a moral and adorns a tale, by invoking the classic tongue of Virgil and Horace.

The decree should be reversed.

*Mr. Otto A. Stiefel,* for the complainant-appellant.

*Mr. William D. Wolfskeil, Mr. W. Holt Apgar* and *Mr. Ralph E. Lum,* for the defendants-respondents.

PER CURIAM.

The decree appealed from will be affirmed, for the reasons stated in the opinion filed in the court below by Vice-Chancellor Bentley.

*For affirmance* — THE CHIEF - JUSTICE, TRENCHARD, PARKER, BLACK, KATZENBACH, CAMPBELL, LLOYD, VAN BUSKIRK, CLARK, McGLENNON, KAYS, JJ. 11.

*For reversal*—MINTURN, J. 1.